1

2

3

4
UNITED STATES DISTRICT COURT

5
NORTHERN DISTRICT OF CALIFORNIA

6
EUREKA DIVISION

7

8
MELISSA F. L.,[1]

9
           Plaintiff,

10
     v.

11
ANDREW SAUL, et al.,

12
           Defendants.

Case No.  20-cv-04821-RMI

**ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 22, 26

13

14
     Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision denying her

15
application for disability insurance benefits and a period of disability under Title II of the Social

16
Security Act. *See AR* at 19.[2] Plaintiff's request for review of the ALJ's unfavorable decision was

17
denied by the Appeals Council (*see id*. at 633-640), thus, the ALJ's decision is the "final decision"

18
of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g),

19
1383(c)(3). Both Parties have consented to the jurisdiction of a magistrate judge (dkts. 8 & 12),

20
and both parties have moved for summary judgment (dkts. 22 & 26). For the reasons stated below,

21
Plaintiff's motion for summary judgment is granted, and Defendant's motion is denied.

22
**LEGAL STANDARDS**

23
     The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be

24
conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set

25

26

27
[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

28
[2] The Administrative Record ("*AR*"), which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #17. *See* (dkts. 17-1 through 17-17).

United States District Court
Northern District of California

aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs*., 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase "substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

On May 29, 2012, Plaintiff filed an application for Title II benefits, alleging an onset date of September 30, 2010. *See AR* at 19. As set forth in detail below, the ALJ found Plaintiff not disabled and denied the application (for the first time) on February 6, 2015. *Id*. at 21-30. The Appeals Council denied Plaintiff's request for review (for the first time) on August 21, 2015. *See id*. at 1-4. Thereafter, Plaintiff (who resided in Sacramento, California at the time) sought review in the United States District Court for the Eastern District of California in October of 2015. *See* Compl. (dkt. 1), Case No. 2:15-cv-02124-AC (Date Filed 10/12/2015). In August of 2016, the district court entered an order on the Parties' stipulation for a voluntary remand for further administrative proceedings such that the ALJ could re-evaluate the opinions of Plaintiff's treating sources. *See id*. (dkt. 24) at 1. Following remand, the Appeals Council in turn remanded the matter to the same ALJ and ordered her to, *inter alia*, re-contact Reza Ehyai, M.D., Plaintiff's treating neurologist (who had previously opined that Plaintiff was disabled), because of a missing page from Dr. Eyahi's June 8, 2012 findings and opinions. *See AR* at 860-61. Following remand to the ALJ, Plaintiff appeared for another three hearings before the ALJ (in May of 2017, in April of

2018, and in November of 2018), after which, the ALJ once again denied Plaintiff's application on February 15, 2019. *See id*. at 648-69. The following month, Plaintiff sought review of the ALJ's decision (*see id*. at 640), which was eventually denied by the Appeals Council on May 13, 2020. *See id*. at 633-37. Thereafter, because Plaintiff had since relocated from the Eastern District of California to this district, she sought review of the second denial of her application in this court on July 17, 2020 (*see* Compl. (dkt. 1) at 1-2) and the instant case was initiated.

## SUMMARY OF THE RELEVANT EVIDENCE

By way of background, Plaintiff earned a university degree in 1993 and worked in various capacities without interruption until 2002 when she was involved in an automobile accident that caused her to suffer back and neck injuries. *See* Pl.'s Mot. (dkt. 22) at 15; *see also* AR at 1175. By 2006, Plaintiff's conditions (persistent pain and fatigue) forced her to reduce her work-schedule to part-time work (10 hours a week) until her symptoms worsened to the point where she was forced to stop working entirely (in September of 2010). *See* Pl.'s Mot. (dkt. 22) at 15. After filing her disability application in 2012, the matter wound its way through administrative proceedings for a number of years, eventually culminating in an adverse decision by an ALJ in 2015, followed by federal court review which resulted in a stipulated remand in 2016 (before the filing of briefing). On remand from federal court, the Appeals Council instructed the ALJ to hire a medical expert to help the ALJ to evaluate the nature, severity, and limiting effects of Plaintiff's impairments. *See* Pl.'s Mot. (dkt. 22) at 24. As to Plaintiff's fibromyalgia, the medical expert opined that Plaintiff is functionally disabled because her condition medically equals the severity of the most closely analogous Listing, which is found at 20 C.F.R., Part 404, Subpt. P, Appx. 1, § 14.06(b). *See* Pl.'s Mot. (dkt. 22) at 24-25. As discussed below, the ALJ's rejection of this opinion was error because the opinion is supported by the overwhelming weight of the medical evidence in the record, because it is consistent with similar findings rendered by Plaintiff's treating physicians, and because it is corroborated by Plaintiff's own accounts of her chronic pain and its ensuing limitations.

//

//

United States District Court
Northern District of California

United States District Court
Northern District of California

1    *Plaintiff's Primary Care Physicians*

2         Plaintiff's treatment history with her primary care physicians, Alvin Sokolov, M.D., and

3    Ronald Sokolov, M.D., spans from well before her alleged onset date to well after the date last

4    insured. *See* AR at 433, 594 (showing Plaintiff's treatment relationship with Sokolov & Sokolov

5    as ranging between – at least – June of 2010 and August of 2014). On June 10, 2010, Plaintiff was

6    treated for pain in her right shoulder which had persisted for several weeks. *Id*. at 433. The

7    following week, on June 18, 2010, her symptoms included fatigue, anxiety, depression, and the

8    onset of pain and weakness in her left shoulder – she was diagnosed with recurrent depression and

9    arthralgia (joint stiffness). *Id*. at 430-32. Several days later, during another office visit on June 30,

10   2010, Dr. Alvin Sokolov diagnosed Plaintiff with recurrent depression, fibromyalgia (a condition

11   that causes widespread pain, sleep problems, fatigue, and mental distress), and myositis (a group

12   of muscle diseases characterized by inflamed muscles causing prolonged muscle fatigue and

13   weakness). *Id*. at 427-28. Thereafter, for the next several months, the record indicates steady and

14   regular treatment sessions for these conditions (at a high frequency and involving, at least,

15   monthly visits and treatment sessions) with little to no success in abating her symptoms. *See id*. at

16   410, 413, 416, 418, 421, 424. During an office visit on February 11, 2011, her treatment providers

17   found that her joint and muscle pain was both sharp and chronic, and that it involved multiple

18   trigger points, that she also experienced bone and joint symptoms, muscle weakness, back pain,

19   and sleep disturbances. *Id*. at 407-09. Her treatment providers continued to make these

20   observations during Plaintiff's many office visits (sometimes involving multiple treatment

21   sessions per month) during the course of the subsequent months. *See id*. at 353, 356, 359, 365,

22   372, 375, 381, 384, 386, 388, 391, 394, 397, 400. A sampling of her treatment providers'

23   assessments and diagnoses is as follows: Plaintiff's fibromyalgia pain has resulted in decreased

24   activity, fatigue, and generalized weakness (*id*. at 398); it has also caused back pain, muscle

25   weakness, neck stiffness, muscle spasms in the cervical spine, and thoracic and lumbar back pain

26   (*id*. at 395-96); Plaintiff's back feels stiff at all times (*id*. at 394); Plaintiff's fibromyalgia is

27   attended with at least 12 trigger points (*id*. at 392); Plaintiff's pain is causing her to experience

28   increased fatigue and malaise (*id*. at 388); the chronic neck and back pain persists (*id*. at 384-85);

by November of 2011, Plaintiff's fibromyalgia had rendered it difficult for her to "sit, stand or walk for any period," given that there are "[m]ultiple trigger points of tenderness thru (sic) [her] body" (*id*. at 375-76); by December of 2011, her physicians describe her fibromyalgia and chronic fatigue as "uncontrolled" (*id*. at 372); by May of 2012, Plaintiff's pain in the thoracic spine is so severe and "burning" that she experiences pain in every position (seated, reclined, etc.) (*id*. at 359-60); in late May of 2012, given that Plaintiff was experiencing "body aches 'everywhere,'" her primary care doctors referred her to a neurologist (*id*. at 365-57); and, in June of 2012, Dr. Ronald Sockolov overserved that Plaintiff's pain precludes her from sitting, bending, lifting, or walking for long periods of time (*id*. at 353).

On June 11, 2012, Dr. Sokolov executed a medical questionnaire, through which he expressed a number of opinions about Plaintiff's functional limitations. *Id*. at 590-91. He opined that: during an 8-hour workday, Plaintiff would be unable to sit, stand, or walk for more than 15 minutes at a time; that Plaintiff is able to lift 5 pounds frequently (between 1/3 and 2/3 of a workday) and 10 pounds occasionally (up to 1/3 of a workday); and, that Plaintiff's abilities are "very limited" with respect to reaching, handling, feeling, pushing, pulling, and grasping. *Id*. Dr. Sokolov also opined that – since October of 2010, Plaintiff's medical problems preclude her from being able to perform any full-time work at any exertional level including the sedentary level. *Id*.

### Plaintiff's Treating Neurologist

Starting on June 8, 2012, following a neurology referral from Dr. Sokolov, Plaintiff began receiving specialized treatment from Reza Ehyai, M.D. *See* AR at 1175-77. Dr. Ehyai then noted Plaintiff's reports of widespread pain by stating that she was experiencing "chronic widespread ache[s] and pain[s] in the upper and lower extremities, neck and posterior shoulder muscles and back pain." *Id*. at 1175. More specifically, Plaintiff complained of spasms and tightness in the muscles of her neck, her posterior shoulder muscles, and also in her thoracic paraspinal muscles; additionally, Plaintiff also complained of constant pain in her lower back and her hips, as well as numbness and a tingling sensation in both hands and both forearms. *Id*. Dr. Ehyai added that Plaintiff "appears slightly tired and, perhaps, depressed." *Id*. at 1176. He also found that the Tinel

United States District Court
Northern District of California

5

sign[3] was positive over both writs and that it was equivocal over the cutital tunnels (which are located in the elbows). An examination of Plaintiff's cervical spine showed "diffuse tenderness in the upper and lower cervical paraspinal muscles with spasm" as well as "diffuse tenderness in the posterior shoulder muscles on deep palpation." *Id*. More specifically, Dr. Ehyai found that "the medial border of the trapezius muscle and scapula are quite tender," and also that "there is tenderness over the sternal border of the pectoralis major." *Id*. He also found that Plaintiff's "[c]ervical and lumbar erector spinae muscles are quite tender," that there are "a few tender spots in both thighs," and that "[t]here is tenderness over the lateral portion of the elbows and [the] medial aspect of the knee." *Id*. at 1176-77. He also observed that the "[r]ange of motion of the cervical spine is decreased in forward flexion and extension," and that there is a "decreased range of motion of the lumbar spine in all directions." *Id*. As a result of these observations – which he made in the course of his neurological examination – Dr. Ehyai diagnosed Plaintiff, *inter alia*, with fibromyalgia, depression secondary to chronic pain, and chronic lower back pain. *Id*. at 1177. Much like Dr. Sokoliv, Dr. Ehyai expressed the following conclusion: "[i]n my opinion, the patient is permanently and totally disabled from any gainful occupation." *Id*.

A few weeks later, on June 27, 2012, Plaintiff returned for further treatment with Dr. Ehyai in relation to her fibromyalgia, her neck pain, her lower back pain, and the pain and paresthesia (pins and needles sensation) in her arms and legs. *Id*. at 337. Dr. Ehyai did another physical examination and noted that – as it relates to Plaintiff's fibromyalgia – "[t]here are numerous trigger points in the posterior shoulder muscles, lumbar paraspinal muscles, [and her] upper and lower extremities." *Id*. Several months later, Plaintiff returned for another follow up visit such that Dr. Ehyai could treat her "multiple neurological problems." *Id*. at 481-82. He noted that there was still "diffuse tenderness over the upper and lower cervical paraspinal muscles and there are

---

[3] The Hoffman-Tinel sign, now more commonly known as the Tinel sign, was defined in 1915 by Paul Hoffmann and Jules Tinel as the "pins and needle feeling" elicited by tapping on a nerve proximally, with resulting paresthesia experienced in the corresponding distal cutaneous distribution of an injured peripheral nerve. The Tinel sign is now used commonly as an indication of peripheral nerve fiber compression or regeneration. *See generally* Tung Ho; Matthew E. Braza, "Hoffmann Tinel Sign." Available on the website of the National Library of Medicine: https://www.ncbi.nlm.nih.gov/books/NBK555934/ (last checked 03/02/2022 at 2:45 pm).

United States District Court
Northern District of California

multiple tender myofascial trigger points over the posterior shoulder muscles, [and in the] lumbar and thoracic paraspinal muscles." *Id*. He also found that the Tinel sign was still positive over both wrists. *Id*. at 782. Once again, he diagnosed Plaintiff with fibromyalgia and carpal tunnel syndrome in both wrists, and he stated for the second time that Plaintiff is "totally disabled." *Id*. In the course of a subsequent follow-up visit, on January 23, 2013, Dr. Ehyai once again observed that Plaintiff's fibromyalgia continued to manifest "diffuse tenderness over the cervical and thoracic paraspinal muscles" as well as continuing to manifest "tenderness over the posterior shoulder muscles." *Id*. at 495-96.

### *Plaintiff's Treating Psychiatrist*

Between September of 2013 and April of 2014, Plaintiff underwent extensive psychotherapy (bi-monthly sessions) with Heather Hall, M.D., for "[a] [c]hronic and persistent level of depression with low energy, anhedonia, [and] insomnia." *See id*. at 576; *see also id*. at 566 (diagnosed with recurrent major depressive affective disorder), 568 (increases in the manifestations of Plaintiff's depression and hopelessness), 570, 572 (Plaintiff "reports increased depression, crying spells, chronic back and neck pain" as well as "having dreams that are related to feelings of shame"), 574, 576 (Plaintiff's depression is complicated by her low self-esteem and anxiety related to certain childhood trauma), 578 (Plaintiff is "stuck in a life that is shameful to her family and keeps her isolated . . . "she reveal[ed] that at least once a week for a year ([at] about age 8 or 9) her father would [sexually abuse] her and [] her younger brother . . ."), 580 (Plaintiff's early childhood was also marked by another abusive relationship where "her mother [would] [be] both physically abusive and neglectful including beatings with wire hangers, kicking, and burning."), 582 (adding a new diagnosis of psychosexual dysfunction and noting that Plaintiff "has extreme difficulty in relationships and has chosen a profession [working as dominatrix] that others would find degrading" and noting that Plaintiff "was unable to see that [that] choice is related to the abuse she suffered [at] the hands of both parents [because of the] impression that her only worth was [as] that of a sex object and [that] she identified with the [role of] the aggressor in response to the physical abuse she received from her mother. She is just now getting in touch with her sense of shame.").

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Based on this course of treatment, on July 25, 2014, Dr. Hall executed a medical source

2    statement through which she opined about the functional limitations associated with Plaintiff's

3    psychiatric conditions. *Id*. at 588. Dr. Hall opined that Plaintiff's ability to relate and interact with

4    supervisors and co-workers is extremely limited (in other words, it is attended with "almost

5    constant impact on work or [a] total limitation") because of her anxiety, depression, and poor

6    social skills. *Id*. As to Plaintiff's ability to withstand the stress and pressures associated with an 8-

7    hour workday and the rigors of day-to-day work, Dr. Hall opined that Plaintiff's "anxiety and

8    depression exacerbate her chronic pain syndrome [and] make this impossible." *Id*. As to the

9    duration of these conditions and limitations, Dr. Hall concluded that "[t]his is a chronic condition

10   that is unlikely to improve." *Id*.

11             *The Medical Expert Retained by the ALJ*

12    This case has been attended with no fewer than four hearings before the ALJ: September

13   16, 2014 (*id*. at 35-90), May 25, 2017 (*id*. at 765-810), April 12, 2018 (*id*. at 723-65), and

14   November 6, 2018 (*id*. at 677-722). At the last hearing, the ALJ heard expert testimony from,

15   Joselyn E. Bailey, M.D., an internal medicine physician with fellowship training in nephrology.

16   *See id*. at 709-720; *see also id*. at 1343-45. Dr. Bailey's testimony began with her noting that she

17   had reviewed Plaintiff's medical records, which she considered to constitute sufficient information

18   upon which to base an opinion to a reasonable degree of medical certainty. *Id*. at 710-11. Upon

19   inquiry form the ALJ, Dr. Bailey listed Plaintiff's medically determinable impairments as

20   including diabetes mellitus, depression, back pain, obesity, fibromyalgia, and thoracic kyphosis

21   (aka, dowagers' hump). *Id*. at 11.

22    Thereafter, despite receiving an answer each time, the ALJ asked Dr. Bailey three separate

23   times whether or not "there's objective physical findings, or any testing, or imaging that supports

24   the chronic pain, the fibromyalgia, or other physical complains by the Claimant." *See id*. at 714-

25   15. Dr. Bailey repeatedly told the ALJ that Plaintiff's neurologist and primary care physician (Drs.

26   Ehyai and Sokolov) had properly rendered that diagnosis based on their identification and

27   examination of Plaintiff's tender points (also referred to as "trigger points") while adding: "[t]hat's

28   the problem with fibromyalgia, it doesn't have any objective findings except for trigger points . . .

8

the previous [method of] diagnosis had to be 11 out of 18 trigger points [but] that definition [is] no longer useful in describing this illness, because there are not really any other objective findings for that diagnosis[,] [i]t's just trigger points, at least that what it used to be, and it's debilitating." *Id*. at 715; *see also id*. at 714 (Dr. Bailey: "Oh, the objective evidence is the fact that she's been seen by a neurologist who has declared that she was permanently and totally disabled. That's about as objective as one can get."); *see also id*. at 719-20 (Dr. Bailey: "Fibromyalgia is a certified disease now. And if she has the trigger points, I mean – and it's a disease that doesn't have any other manifestations. It doesn't have any abnormal blood tests, not abnormal – no – nothing to go on except the physical characteristics."). When the ALJ asked Dr. Bailey whether or not Plaintiff's trigger points were documented in the record, Dr. Bailey quoted from Dr. Ehyai's neurologic evaluation and informed the ALJ that "[t]here are numerous trigger points in the posterior shoulder muscles, lumbar paraspinal muscles, [and in the] upper and lower extremities." *Id*. at 715. Dr. Bailey then noted that, while there is no listing for fibromyalgia, the combination of Plaintiff's conditions equal the severity of the criteria found at Listing 14.06(b) (undifferentiated and mixed connective tissue disease).[4] *Id*. at 718. Dr. Bailey then added that the record supports the conclusion that Plaintiff's impairments combine to medically equal the requirements of Listing 14.06(b) as of September 30, 2010 – and, with that, the ALJ adjourned the hearing. *Id*. at 719-21.

### *Vocational Expert ("VE") Testimony*

At the third evidentiary hearing in this case (on April 12, 2018), the VE testified that if a person were required to miss more than 1 day of work per month on a regular basis, that person would be unemployable. *Id*. at 757. At the second evidentiary hearing (on May 25, 2017), the VE testified that if a person was required to lie down and recline for as little as two hours during an 8-hour workday, or if the person would be off-task for as little as 15% of the workday, that person would be unable to secure any form of competitive employment. *Id*. at 807-08. Indeed, during the

---

[4] The requirements of Listing 14.06(b) involve repeated manifestations of undifferentiated or mixed connective tissue disease, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level: (1) Limitation of activities of daily living; (2) Limitation in maintaining social functioning; (3) Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. *See* 20 C.F.R., Part 404, Subpt. P, Appx. 1, § 14.06(b).

first evidentiary hearing (on September 16, 2014) the VE had already testified that being off-task as little as 15% of the workday is "generally work preclusive." *See id*. at 89.

### Opinions Rendered by Consultative Examiners

On January 3, 2011, Plaintiff was referred to Silvia Torrez, Psy.D., for a one-time psychological consultative examination. *See id*. at 328-34. Observing that Plaintiff "gets easily fatigued," Dr. Torrez diagnosed her with depressive disorder while assessing her abilities to function in the workplace as mostly "good," with the exception that Plaintiff's ability to complete a normal workday without interruptions and her ability to deal with changes in the work setting were described as "fair." *See id*. at 333-34. Two years later, on May 25, 2013, Plaintiff was referred to Deborah Lacy, Psy.D., for a second one-time psychological consultative examination. *See id*. at 511-19. Diagnosing Plaintiff with dysthymic disorder and a personality disorder, Dr. Lacy opined that in most areas of work-related function, Plaintiff was either unimpaired or only mildly impaired with the exception that her ability to interact with others and her ability to deal with usual workplace stress were "moderately impaired." *Id*. at 517-18. Then, four years later, on March 23, 2017, Plaintiff was referred to Alysia Liddell, Ph.D., for a third one-time psychological consultative examination. *See id*. at 1311-16. Dr. Liddell diagnosed Plaintiff as suffering from two conditions (in addition to fibromyalgia and diabetes): pain disorder and adjustment disorder with depressed mood. *Id*. at 1315. She then opined that Plaintiff was unimpaired in all of the categories of work-related functioning, except that she was "mildly impaired" in her ability to deal with various changes in a work setting, "given her depression," which (oddly) was not included in Dr. Liddell's list of diagnoses. Lastly, on March 25, 2017 (nearly three years after Plaintiff's date last insured) Plaintiff was referred to Dolores M. Leon, M.D., for a one-time consultative examination by an internal medicine specialist. *See id*. at 1323-34. Dr. Leon observed that Plaintiff experienced sharp pain in her lower back upon any effort to raise either leg. *Id*. at 1327. She diagnosed Plaintiff with fibromyalgia with chronic fatigue, as well as uncontrolled diabetes with neuropathy, but opined that Plaintiff could: stand, sit, or walk for up to six hours per day; that she could occasionally lift, carry, push, or pull 20 pounds; that she could frequently push, pull, lift, or carry 10 pounds; that she could stoop, crouch, kneel, crawl, and climb stairs frequently; and that she can

1    handle, finger, feel, and reach (forwards and overhead) frequently. *Id*. at 1328.

2                    *Plaintiff's Other Musculoskeletal and Rheumatic Conditions*

3            In June of 2010, Plaintiff's physical therapist noted that Plaintiff "presents with increased

4    thoracic kyphosis," (*id*. at 457) a condition which was confirmed by Dr. Bailey upon her review of

5    Plaintiff's records (*id*. at 711). As explained by Dr. Bailey, kyphosis is an excessive outward

6    curvature of the spine, causing a hunching of the back. *See id*. ("what that means is there is a

7    disorder of the curvature of the spine, and which creates problems, especially if someone becomes

8    overweight, or as one gets older."). Additionally, in September of 2018, Plaintiff underwent MRI

9    imagining of her lumbar spine due to her clinical history of lower back pain and lower extremity

10   radiculopathy. *Id*. at 1347-48. Plaintiff's interventional radiologist, David E. Goller, M.D.,

11   reviewed the results and found central canal narrowing and broad-based disc protrusion in several

12   of Plaintiff's thoracic and lumbar vertebrae. *Id*. at 1347. He found degenerative changes of varying

13   severity (ranging from mild to moderate) in Plaintiff's lower thoracic and lumbar spine, in

14   addition to the neural foraminal narrowing in the vertebral bodies of her lower lumbar spine. *Id*. at

15   1348.

16       **THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

17           A person filing a claim for social security disability benefits ("the claimant") must show

18   that she has the "inability to do any substantial gainful activity by reason of any medically

19   determinable physical or mental impairment" which has lasted or is expected to last for twelve or

20   more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[5] The ALJ must consider all evidence in

21   the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-

22   step sequential evaluation process to determine whether the claimant is disabled (*id*. § 416.920).

23   "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the

24   claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

25           Here, the ALJ set forth the applicable law under the required five-step sequential

26

27   ───────────────────────
     [5] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II)
28   are virtually identical though found in different sections of the CFR. For the sake of convenience, the court
     will generally cite to the SSI regulations herein unless it is necessary to note otherwise.

*United States District Court*
*Northern District of California*

1   evaluation process. *AR* at 649-51. At Step One, the claimant bears the burden of showing she has

2   not been engaged in "substantial gainful activity" during the period between her alleged onset date

3   (September 30, 2010) and the date last insured (June 30, 2014). *See* 20 C.F.R. § 404.1571 *et seq*.

4   If the claimant has worked and the work is found to be substantial gainful activity, the claimant

5   will be found not disabled. *See id*. The ALJ found that Plaintiff had not engaged in substantial

6   gainful activity during this period. *AR* at 651.

7         At Step Two, the claimant bears the burden of showing that she has a medically severe

8   impairment or combination of impairments. *See* 20 C.F.R. § 404.1520(c); 416.920(a)(4)(ii), (c).

9   "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight

10  abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'"

11  *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). At Step

12  Two, the ALJ found that Plaintiff suffered from the following severe impairments: lumbar

13  degenerative disc disease, carpal tunnel syndrome, and fibromyalgia with chronic pain. *Id*. at 651.

14  At Step Three, the ALJ compares the claimant's impairments to the impairments listed in

15  appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the

16  burden of showing her impairments meet or equal an impairment in the listing. *Id*. If the claimant

17  is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful,

18  the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four.

19  *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or

20  combination of impairments that met or medically equaled the severity of any of the listed

21  impairments. *AR* at 652-53. Next, the ALJ determined that Plaintiff retained the RFC to perform

22  work at the light exertional level subject to the following limitations and exceptions: she can

23  frequently climb ramps and stairs; she can occasionally climb ladders, ropes, and scaffolds; she

24  can frequently stoop, kneel, crouch, and occasionally crawl; she can frequently handle, finger, and

25  feel with both hands; she must avoid moderate exposure to vibrations and concentrated exposure

26  to hazards; she is capable of non-public work; and, she can only occasionally work in the

27  proximity of the public, but with only superficial interactions. *Id*. at 653-66.

28        At Step Four, the ALJ determined that between the onset date and the date last insured,

United States District Court
Northern District of California

12

1    Plaintiff was unable to perform her past relevant work. *Id*. at 666. Lastly, at Step Five, the ALJ

2    concluded, based on the RFC, Plaintiff's age, education, and the VE's testimony, that there are

3    jobs that exist in significant numbers which Plaintiff could perform – namely, the ALJ found that

4    Plaintiff could work as an office helper, a photocopier, or a parking lot attendant. *Id*. at 667-68.

5    Thus, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social

6    Security Act, between September 30, 2010 (the alleged onset date) and June 30, 2014 (the date last

7    insured). *Id*. at 668.

**DISCUSSION**

9         Nearly 10 years have passed since Plaintiff filed her Title II application on May 29, 2012.

10   During this period, the ALJ has written two opinions, retained several experts and even more

11   consultants (including 3 psychologists), and convened no less than four hearings. Upon review of

12   the record in this case, it is abundantly clear that Plaintiff is disabled. At the outset, the court will

13   note some generalities about fibromyalgia. This condition causes pain all over the body (also

14   referred to as widespread pain), sleep problems, fatigue, and emotional and mental distress – the

15   essence of this condition is that it causes those afflicted with it to experience greater sensitivity to

16   pain, which is sometimes referred to as abnormal pain perception processing.[6] It is most

17   commonly attended with pain and stiffness all over the body as well as some combination of the

18   following ancillary symptoms: fatigue, depression and anxiety, sleep problems, certain cognitive

19   problems (such as issues with thinking, memory, or concentration), and headaches or migraines.

20   *Id*. Of the various complications associated with fibromyalgia, two should be noted here as they

21   are relevant to the specifics of Plaintiff's case. First, it should be noted that "[a]dults with

22   fibromyalgia are more than 3 times more likely to have major depression than adults without

23   fibromyalgia," and second, "[f]ibromyalgia often co-occurs with other types of arthritis such as

24   osteoarthritis, rheumatoid arthritis, systemic lupus erythematosus, and ankylosing spondylitis." *Id*.

25   The court will note that ankylosing spondylitis is an inflammatory disease that, over time, can

26

27

28

---

[6] *See* Centers for Disease Control and Prevention: Fibromyalgia.
https://www.cdc.gov/arthritis/basics/fibromyalgia.htm (last checked March 6, 2022 at 1:04 pm)

United States District Court
Northern District of California

1    cause some of the spinal vertebrae to fuse (thereby diminishing spinal flexibility), which results in

2    a forward hunched posture (called kyphosis).[7]

3         Fibromyalgia is a frequent subject of misunderstanding and mishandling by ALJs who

4    rely on their own disbelief of claimants' complaints about pain as a basis to reject the opinions of

5    treating and examining professionals. *See e.g., Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir.

6    2004) ("[T]he ALJ erred in discounting the opinions of Benecke's treating physicians, relying on

7    his disbelief of Benecke's symptom testimony as well as his misunderstanding of fibromyalgia.");

8    *see also Campbell v. Astrue*, No. SA CV 07-864-PLA, 2008 U.S. Dist. LEXIS 87626, 2008 WL

9    4792672, at *10 (C.D. Cal. Oct. 29, 2008) ("[T]he ALJ's finding that Dr. Tsay relied quite heavily

10   on the subjective report of symptoms and limitations . . . does not constitute a specific and

11   legitimate reason for discounting Dr. Tsay's assessments . . . Dr. Tsay's reliance on plaintiff's

12   subjective complaints hardly contradicts her findings concerning plaintiff's functional limitations,

13   as [a] patient's report of complaints, or history, is an essential diagnostic tool. . . . This is

14   especially true where plaintiff was diagnosed with, *inter alia*, fibromyalgia, which is a diagnosis

15   that often lacks objective clinical findings.") (internal quotation marks and citations omitted). As

16   described below, this is *exactly* what happened in this case as well.

17        At the fourth evidentiary hearing in this case, the ALJ repeatedly (no fewer than three

18   times) asked Dr. Bailey to point to "objective findings to support the diagnosis of fibromyalgia" in

19   this case. *See* AR at 714; *see also id*. at 715 ("I'm just wondering if there's objective physical

20   findings, or any testing, or imaging that supports the chronic pain, the fibromyalgia, or the other

21   physical complaints by the Claimant?"). As mentioned above, Dr. Bailey repeatedly stated that

22   "[f]ibromyalgia is a certified disease now [] [a]nd if she has the trigger points, I mean - - and it's a

23   disease that doesn't have any other manifestations . . . [i]t doesn't have any abnormal blood tests .

24   . . nothing to go on except the physical characteristics." *Id*. at 719-20.

25        As is evident from the ALJ's written opinion, the ALJ was never able to fully digest Dr.

26

27   ───────────────────
     [7] *See* Mayo Clinic: Ankylosing Spondylitis.
     https://www.mayoclinic.org/diseases-conditions/ankylosing-spondylitis/symptoms-causes/syc-20354808
28   (last checked March 6, 2022 at 1:13 pm)

United States District Court
Northern District of California

Bailey's testimony in this regard (or the medical records and opinions from any of Plaintiff's treating physicians). *See id.* at 652-66. The ALJ rejected Dr. Bailey's opinion: (1) because it supposedly relied on Dr. Ehyai's "conclusory" opinion about Plaintiff's disability; (2) because Dr. Bailey supposedly "admitted that she did not check the rest of the record to determine if the trigger point findings continued throughout the [disability] period at issue"; and (3) that Dr. Bailey's opinions are generally not consistent with "the other opinions in the record." *Id.* at 661. The ALJ rejected Dr. Sokolov's opinions because the ALJ found that "it appears that Dr. Sokolov relied heavily on the claimant's own subjective statements about her limitations rather than on objective findings of physical disease." *Id.* at 660. Next, the ALJ rejected the opinions Dr. Ehyai, Plaintiff's treating neurologist: (1) because Dr. Ehyai's opinion that Plaintiff's condition prohibits her from being able to work at all "is not a medical opinion"; (2) because "Dr. Ehyai provided no specific work limitations, explanation, or rationale to explain the opinion"[8]; (3) because Dr. Ehyai's opinions are supposedly inconsistent with certain treatment notes showing "symmetrical reflexes, normal muscle strength and no radiular symptoms"[9]; and (4) because Dr. Ehyai's opinions are

---

[8] The ALJ's reliance on what she perceived to be an ambiguity in the record for the rendering of a non-disability finding constitutes an independent error. It is well established that because the underlying administrative proceedings before an ALJ are not adversarial, ALJs have a duty to develop the record in such a manner as to allow for a full and fair disability determination; and, this "duty to fully and fairly develop the record" is meant to "assure that [a] claimant's interests are considered." *Garcia v. Comm'r of Soc. Sec.*, 768 F.3d 925, 930 (9th Cir. 2014) (citation omitted); *see also Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) ("In making a determination of disability, the ALJ must develop the record and interpret the medical evidence."). Indeed, an ALJ's duty to develop the record "further" is triggered when there is "ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *See McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2010) (as amended May 19, 2011) (citation omitted); *see also Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) ("Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.'" (citing *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)). If the ALJ believed that Dr. Ehyai's opinions could have benefited from further elaboration or explanation, her duty to develop a proper and fair record required her to contact Dr. Ehyai and request that additional information such as to ensure that Plaintiff's interests are considered. Here, the ALJ not only failed to discharge that duty, but she expressly relied on what she perceived to be an ambiguity in the record as a foundation on which to base a non-disability finding. However, remand for further proceedings is unnecessary because (as discussed below) Plaintiff is clearly disabled and further proceedings would be useless.

[9] The ALJ's opinion makes no effort to venture to explain what might constitute the supposed inconsistency between "symmetrical reflexes," "normal muscle strength," and the absence of "radicular symptoms," and the existence of fibromyalgia.

supposedly inconsistent with the "longitudinal record documenting little treatment other than medication during the relevant period." *See* AR at 660. Lastly, the ALJ rejected the opinion of Dr. Hall (Plaintiff's treating psychiatrist) for a number of reasons. *See id.* at 664-65. First, the ALJ stated that "this opinion [from July 25, 2014] was rendered after the end of the relevant period on June 30, 2014. *Id.* at 664.[10] Second, the ALJ premised the rejection of Dr. Hall's opinion as to Plaintiff's work-related limitations – from a psychiatric perspective – on the odd notion that "the opinion is inconsistent with Dr. Hall's treatment notes showing few, if any, objective findings on examinations other than some depressed and anxious moods." *Id.* at 664. The court must take a moment, before continuing, to note that this statement is quite glaringly incorrect; as recited above, Dr. Hall's opinion was based on extensive psychotherapy over a substantial amount of time and through many sessions, after which she managed to sufficiently secure Plaintiff's trust and confidence in order to develop a clear picture of the abuse and privation that Plaintiff experienced as a child – traumas which continue to dominate her psyche to this very day. *See generally id.* at 566-88. The ALJ simply and casually dismissed this history of trauma by noting that Dr. Hall's "[t]reatment notes mostly concerned the claimant's 'childhood maltreatment' by her mother [and] [t]here were few, if any, reports of current verbal or physical conflicts with others." *See id.* at 665.

---

[10] The court should first note that this temporal issue (a matter of four weeks) did not dissuade the ALJ from giving "substantial weight" to the opinion of Dr. Leon (a consultative examining psychologist who examined Plaintiff nearly 3 years after the disability period in question and found that Plaintiff was not seriously impaired in any domain of work-related function). *See* AR at 658-59. The court should also note that ample authority supports the relevance of an examination or opinion rendered after the relevant Title II disability period in the absence of evidence that a claimant's condition worsened during the gap between the end of the disability period and the date of the subsequent examination or opinion. *See Tobeler v. Colvin*, 749 F.3d 830, 833 (9th Cir. 2014) ("Bandy's statement that Tobeler was incapable of working in 2001 is relevant to his ability to work in 1999, at least in the absence of any evidence that Tobeler's condition worsened between 1999 and 2001."); *Kish v. Colvin*, 552 Fed. Appx. 650, 651 (9th Cir. 2014) ("Evaluations conducted after the last insured date can still be relevant to assessing a claimant's condition during the appropriate period."); *Barnard v. Comm'r*, 286 F. App'x 989, 994 (9th Cir. 2008) ("In fact, it is not uncommon that a physician's examination completed two or more years after the insured status expiration date is considered relevant."); *Wakefield v. Astrue*, 267 F. App'x 682, 683 (9th Cir. 2008) (finding that the fact that a physician began treating the claimant after the claimant's date last insured was not a specific and legitimate reason for rejecting the physician's opinion); *McCartey v. Massanari*, 298 F.3d 1072, 1077 n.7 (9th Cir. 2002) (holding that the Appeals Council erred in determining that medical records after the date last insured were immaterial because they were probative of the fact that claimant was disabled before the date last insured); *Sampson v. Chater*, 103 F.3d 918, 922 (9th Cir. 1996) ("Medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the pre-expiration condition.") (quoting *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988)).

1    Lastly, the ALJ also premised her rejection of Dr. Hall's opinion on the statement that "[t]he

2    opinion is inconsistent with other opinions in the record." *Id*.

3          Based on the record as described above, Plaintiff submits that due to the ALJ's improper

4    weighing of the evidence, this case satisfies the conditions of the credit-as-true doctrine because

5    the ALJ failed to provide legally sufficient reasons for rejecting this evidence; because, when

6    properly credited, the evidence would require the ALJ to find Plaintiff disabled on remand;

7    because there are no outstanding issues that need to be resolved before a disability determination

8    may be rendered; and, because a review of the record as a whole does not give rise to any serious

9    doubt that Plaintiff is, in fact, disabled. *See* Pl.'s Mot. (dkt. 22) at 21-33; *see also* Pl.'s Reply (dkt.

10   29) at 6. Defendant disagrees in all respects and submits that the ALJ committed no reversible

11   error whatsoever; however, Defendant adds that if the court finds reversible error, the proper

12   remedy is remand for further proceedings due to the notion that "[n]umerous inconsistencies and

13   factual issues raise serious doubt about whether Plaintiff is disabled and illustrate why further

14   proceedings would be necessary . . ." *See* Def.'s Mot. (dkt. 26) at 18-38.

15         The ALJ committed no shortage of errors in the handling of this case. Initially, the court

16   must note that the ALJ omitted any analysis of Plaintiff's depression at Step Two. *See AR* at 651-

17   52. As mentioned, Step two is "a *de minimus* screening device [used] to dispose of groundless

18   claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). Therefore, "applying our normal

19   standard of review to the requirements of step two, [the Court] must determine whether the ALJ

20   had substantial evidence to find that the medical evidence clearly established that [Plaintiff] did

21   not have a medically severe [depression] impairment." *Webb v. Barnhart*, 433 F.3d 683, 687 (9th

22   Cir. 2005). Nevertheless, even overlooking the ALJ's errors at Step Two and in developing the

23   record (*see supra* n.8), a review of the ALJ's opinion in light of the evidentiary record in this case

24   (as summarized above) reveals that the ALJ's non-disability finding is due to be reversed because

25   it was based on an improper weighing of the evidence where the ALJ erroneously rejected the

26   extremely well-supported findings and opinions of Plaintiff's primary care physician (Dr.

27   Sokolov), her treating neurologist (Dr. Ehyai), her treating psychiatrist (Dr. Hall), and the ALJ's

28   own medical expert (Dr. Bailey), while adopting the unsupported opinions of non-examining state

United States District Court
Northern District of California

17

agency consultants, and several one-time examiners. *See AR* at 653-66. Even in combination, the unsupported opinions adopted by the ALJ do not approach the quantum necessary to be considered substantial evidence – at least not when viewed through the lens of the overwhelming body of evidence supporting the opinions of Drs. Bailey, Sokolov, Ehyai, and Hall.

In rejecting Dr. Hall's work-preclusive opinions related to the symptoms and effects of Plaintiff's major depressive disorder and anxiety, the ALJ offered nearly nothing by way of a plausible explanation. *See id.* at 664-65. The ALJ faulted Dr. Hall for relying on Plaintiff's "subjective statements," rather than on "objective findings on examinations other than some depressed and anxious moods." *See id.* at 664. The ALJ also premised the rejection of Dr. Hall's opinion on the notion that the opinion was "inconsistent" with Plaintiff's ability to "drive a car," "shop for food," "have a boyfriend," "read," and "follow television programs and movies without significant difficulty." *Id.* at 665. This approach is grossly misguided because no amount of "objective physical examination findings" would reveal the hallmarks or limiting effects of emotional disorders such as depression and anxiety. Indeed, this error in reasoning occurs so frequently that it has led to a wealth of case authority repeatedly lambasting the flaws in SSA's penchant for dismissing the opinions of treating psychiatrists and psychologists regarding the effects of mental illnesses because those opinions relied in some part on self-reports. In short, it is now axiomatic that mental health evaluations "will always depend in part on the patient's self-report" because "'unlike a broken arm, a mind cannot be x-rayed.'" *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (quoting *Poulin v. Bowen*, 817 F.2d 865, 873 (D.C. Cir. 1987)). Accordingly, "the rule allowing an ALJ to reject opinions based on self-reports [about physical impairments] does not apply in the same manner to opinions regarding mental illness." *Buck*, 869 F.3d at 1049. Moreover, an ALJ may not reject a medical source opinion simply because it is based on the claimant's self-reports when the medical source analyzes those self-reports using objective measures such as a clinical interview and mental status examinations. *Id.* As for the ALJ's effort at drawing an equivalence between certain activities of daily life such as watching the television, shopping for food, and reading – these concerns can be fairly rephrased as such: "if you can shop for food, drive a car, and watch a movie, then you can work." However, in order for this

United States District Court
Northern District of California

attempt at drawing such equivalences between daily living activities and work-related activities, the ALJ would have needed to explain how activities such as shopping for food, or having a boyfriend can be said to be "transferable to a work setting" or how they might "contradict claims of a totally debilitating impairment." *Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012). Here, at Step Five, the ALJ found that Plaintiff could work as an office helper, a photocopier, or a parking lot attendant and the court sees no transferability between these job functions and Plaintiff's residual ability to read, have a boyfriend, shop for food, or follow television programs without significant difficulty.

In rejecting the opinions of Drs. Sokolov and Ehyai, the ALJ similarly relied on her own failure to develop the record (regarding Dr. Ehyai's opinion) as well as on the notion that Plaintiff's fibromyalgia diagnosis "relied heavily on the claimant's own subjective statements about her limitations rather than on objective findings of physical disease" (*see* AR at 660), because Dr. Ehyai's opinion that Plaintiff's condition prohibits her from being able to work at all "is not a medical opinion" (*see id*.), and because Dr. Ehyai's opinions are supposedly inconsistent with certain treatment notes showing "symmetrical reflexes, normal muscle strength and no radicular symptoms (*id*). Also, the ALJ rejected Dr. Bailey's confirming opinion because "[w]hen asked what evidence she used to support her opinion, she cited [to medical records from Drs. Sokolov and Ehyai] and [also to] Dr. Ehyai's conclusory statement of disability." *Id*. at 661. The ALJ also premised the rejection of Dr. Bailey's opinion on the following notion: "[w]hen asked to identify the specific medical findings that support the diagnosis of fibromyalgia, [Dr. Bailey] stated the only physical finding was positive trigger points and cited merely to [Dr. Ehyai's November 25, 2011, identification of "[m]ultiple trigger points of tenderness thru (sic) [her] body" (*see id*. at 376)] [but] [s]he admitted that she did not check the rest of the record to determine if the trigger point findings continued throughout the period at issue." *Id*. at 661. As to the trigger points (which, as discussed below, reflect the outdated and now-abandoned method for diagnosing fibromyalgia) the court will note two things: first, Dr. Ehyai did describe his findings and observations about Plaintiff's trigger points (sometimes called "tender points") during almost every one of their six or more encounters during the second half of 2012 and in early 2013 (*see id*.

at 337-40, 343, 481, 480, 495, 499); and second, Dr. Ehyai was not the only physician to identify and evaluate Plaintiff's trigger points. Dr. Sokolov (or staff in his office) also found the existence of "multiple trigger points" with great regularity throughout 2011 (*see id*. at 407-409 (February 11, 2011); *see also id*. at 391-92 (June 9, 2011); *see also id*. at 375-76 (November 25, 2011)) and again in the first half of 2012 (*see id*. at 591 (June 11, 2012)). In other words, there is no doubt that Plaintiff was found to experience pain in trigger points all over her body, throughout the relevant period.

In any event, that discussion is rendered academic by more recent developments in the understanding of fibromyalgia which have caused a significant shift in how the disease is diagnosed – rendering trigger points less determinative of the diagnosis than what has been the case in previous years. As mentioned above, fibromyalgia "appears to be linked to changes in how the brain and spinal cord process pain signals . . . [and] [d]iagnostic guidelines from the American College of Rheumatology now include widespread pain throughout your body for at least three months . . . defined as pain on both sides of your body, as well as above and below your waist."[11] Thus, until fairly recently, Fibromyalgia would often be characterized by additional pain when firm pressure is applied to specific areas of your body, called tender points or trigger points. *Id*. "In the past, at least 11 of these 18 spots had to test positive for tenderness to diagnose fibromyalgia." *Id*. Because fibromyalgia symptoms can come and go, a person might have 11 tender points one day but only ten or eight tender points on another day – and because "many doctors were uncertain about how much pressure to apply during a tender point exam," (while specialists or researchers may still use tender points) "they are no longer required for your family doctor to make a diagnosis of fibromyalgia." *Id*. Accordingly, the ALJ (a) was unfamiliar with the record in this case which clearly demonstrated the existence of numerous trigger points throughout Plaintiff's body on a multitude of occasions from 2011 through early 2013, and (b) failed to accept Dr. Bailey's attempt at describing the new diagnostic standard of "widespread pain" in lieu of

---

[11] *See* Mayo Clinic – Fibromyalgia: Understand How It's Diagnosed
https://www.mayoclinic.org/diseases-conditions/fibromyalgia/in-depth/fibromyalgia-symptoms/art-20045401 (last checked March 6, 2022 at 3:29 pm)

"tender points." Further, it cannot be reasonably contended that the record did not clearly manifest Plaintiff's affliction with widespread fibromyalgia pain throughout the entire disability period.

Medical opinions are "distinguished by three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The medical opinion of a claimant's treating provider is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); *see also Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017). In cases where a treating doctor's opinion is not controlling, the opinion is weighted according to factors such as the nature and extent of the treatment relationship, as well as the consistency of the opinion with the record. 20 C.F.R. § 404.1527(c)(2)-(6); *Revels*, 874 F.3d at 654. As to areas of specialization, greater weight is generally accorded to the opinion of a specialist than to the opinion of a non-specialist. *See Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) ("Additional factors relevant to evaluating any medical opinion . . . include . . . the specialty of the physician providing the opinion."); *see also Reed v. Massanari*, 270 F.3d 838, 845 (9th Cir. 2001).

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss*, 427 F.3d at 1216); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his [or her] interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v.*

*Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Further, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831; *see also Revels*, 874 F.3d at 654-55; *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67 n.2 (9th Cir. 2006); *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993). In situations where a Plaintiff's condition progressively deteriorates, the most recent medical report is the most probative. *See Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986).

Assuming that all of the opinions of Dr. Bailey and Plaintiff's treating physicians were "contradicted," the court finds that the ALJ failed to express anything remotely resembling specific or legitimate reasons for rejecting those opinions (let alone specific and legitimate reasons that are based on substantial evidence). Indeed, the court finds that the only body of "substantial evidence" in the record supports the opinions of Drs. Bailey, Sokolov, Ehyai, and Hall. Given that the definition of "substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (*see Biestek*, 139 S. Ct. at 1154), the court concludes that the entirety of the ALJ's decision, at least from Step Three forward, is completely divorced from the body of substantial evidence in the record before this court. Thus, because the ALJ improperly rejected the opinions of Drs. Bailey, Sokolov, Ehyai, and Hall, those opinions will now be credited as true as a matter of law. *See Lester*, 81 F.3d at 834 ("[w]here the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion as a matter of law."); *see also Benecke*, 379 F.3d at 594 ("Because the ALJ failed to provide legally sufficient reasons for rejecting Benecke's testimony and her treating physicians' opinions, we credit the evidence as true.").

## Nature of Remand

The decision whether to remand for further proceedings or for payment of benefits generally turns on the likely utility of further proceedings. *Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1169 (9th Cir. 2008). A district court may "direct an award of benefits where the record has been fully developed and where further administrative proceedings would serve no useful purpose." *Smolen*, 80 F.3d at 1292. The Court of Appeals for the Ninth Circuit has established a

United States District Court
Northern District of California

22

three-part test "for determining when evidence should be credited and an immediate award of benefits directed." *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Remand for an immediate award of benefits is appropriate when: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and, (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id*. The second and third prongs of the test often merge into a single question; that is, whether the ALJ would have to award benefits if the case were remanded for further proceedings. *Id*. at 1178 n.2; *see also Garrison v. Colvin*, 759 F.3d 995, 1021-23 (9th Cir. 2014) (when all three conditions of the credit-as-true rule are satisfied, and a careful review of the record discloses no reason to seriously doubt that a claimant is, in fact, disabled, a remand for a calculation and award of benefits is required).

Initially, the court will note that in light of the above-discussed and improperly discredited medical opinion evidence, two things are clear: first, it is clear that Plaintiff has in fact been disabled since her alleged onset date, and second, it is clear that further administrative proceedings would be useless because no further record development is necessary as the ALJ would be required to find Plaintiff disabled on remand based on the evidence and opinions that have been herein credited as true. This is true even if one were to put aside Dr. Bailey's opinion that Plaintiff's degenerative disc disease, fibromyalgia, kyphosis, depression, anxiety, carpal tunnel syndrome, and obesity combine to (at least) equal the severity of the criteria found at 20 C.F.R., Part 404, Subpt. P, Appx. 1, § 14.06(b). It does appear to the undersigned that the combination of Plaintiff's conditions would indeed equal the severity of the conditions and limitations outlined in Listing 14.06(b) in that Plaintiff's conditions equate the severity of "[r]epeated manifestations of [] mixed connective tissue disease with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level: (1) limitation of activities of daily living; (2) limitation in maintaining social functioning; (3) limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace." *Id*. The combination of the opinions of Drs. Sokolov, Ehyai, and Hall (as detailed above)

23

1   go well beyond the minimum that would be necessary to establish medical equivalency of the

2   severity of the requirements of Listing 14.06(b).

3          Furthermore, it cannot be reasonably disputed that the evidence that has been herein

4   credited as true would necessitate a disability finding during the formulation of the RFC as it is

5   clear that Plaintiff retains no residual functioning capacity to perform in the workplace at all. All

6   three of his treating physicians unequivocally opined to that effect. Based on his extensive

7   treatment relationship with Plaintiff, Dr. Sokolov concluded that (since October of 2010)

8   Plaintiff's medical problems have combined to preclude her from being able to perform any full-

9   time work at any exertional level including the sedentary level. *See* AR at 590-91. Plaintiff's

10  treating neurologist, Dr. Ehyai, concurred and opined (on more than one occasion) that Plaintiff is

11  "permanently and totally disabled from any gainful occupation." *See id*. at 782, 1177. Plaintiff's

12  treating psychiatrist, Dr. Hall, opined that Plaintiff's ability to relate and interact with supervisors

13  and co-workers is extremely limited (which means that it is attended with "almost constant impact

14  on work or [a] total limitation") because of her anxiety, depression, and poor social skills. *See id*.

15  at 588. More importantly, regarding Plaintiff's ability to withstand the stress and pressures

16  associate with an 8-hour workday and her ability to withstand the rigors of day-to-day work, Dr.

17  Hall concluded that Plaintiff's "anxiety and depression exacerbate her chronic pain syndrome

18  [and] make this impossible." *Id*. As to the duration of these conditions and limitations, Dr. Hall

19  found that "[t]his is a chronic condition that is unlikely to improve." *Id*. Crediting all of these

20  opinions as true means Plaintiff has no residual capacity to function in the workplace at all.

21         And, lastly, it is equally clear that on remand, the ALJ would be required to find Plaintiff

22  disabled based on the testimony of the VE. As mentioned above, the VE testified that missing

23  more than 1 workday per month on a regular basis (*see* AR at 757) or needing to lie down and

24  recline for as little as two hours during an 8-hour workday, or being off-task for as little as 15% of

25  the workday (*id*. at 89, 807-08), would render someone unable to secure any form of competitive

26  employment. Plaintiff's depression alone – as explained by Dr. Hall – would satisfy these criteria,

27  let alone in combination with her fibromyalgia, degenerative disc disease, and other conditions.

28         At this juncture, it should be noted that in cases where each of the credit-as-true factors is

United States District Court
Northern District of California

met, it is generally only in "rare instances" where a review of the record as a whole gives rise to a "serious doubt as to whether the claimant is actually disabled." *Revels*, 874 F.3d at 668 n.8 (citing *Garrison*, 759 F.3d at 1021). This is not one of those "rare instances," as the record leaves no room to doubt that Plaintiff has in fact been disabled, at least since her alleged onset date, if not earlier. Needlessly remanding a disability claim for further unnecessary proceedings would only delay much needed income for claimants such as Plaintiff who are unable to work and who are entitled to benefits; doing so would in turn subject them to "tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand." *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1398 (9th Cir. 1988). The court finds that the ALJ's unsupported conclusions in this case were thoroughly negated by the overwhelming weight of the record evidence which conclusively and convincingly established Plaintiff's disability such that no further inquiry is necessary.

## CONCLUSION

Accordingly, for the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 22) is **GRANTED**, and Defendant's Cross-Motion (dkt. 26) is **DENIED**. The ALJ's finding of non-disability is **REVERSED**, and the case is **REMANDED** for the immediate calculation and award of appropriate benefits consistent with the findings and holdings expressed herein.

**IT IS SO ORDERED.**

Dated: March 9, 2022

_____
ROBERT M. ILLMAN
United States Magistrate Judge

United States District Court
Northern District of California